GLASPELL *v.* NORTHERN PAC. R. Co.

*(Circuit Court, D. North Dakota.* November 3, 1890.)

1. DECEIT—MEASURE OF DAMAGES.
In an action for deceit in misrepresenting the value of land sold, the measure of damages under Code Dak. § 1967, (providing that the measure of damages for the breach of an obligation not arising from contract, except where otherwise provided, is the amount which will compensate for all the detriment proximately caused thereby,) is the loss sustained by reason of the fraud. Following *Smith v. Bolles,* 132 U. S. 125, 10 Sup. Ct. Rep. 39; *Atwater v. Whiteman,* 41 Fed. Rep. 427.

2. SAME—INSTRUCTIONS.
In such an action an instruction to the effect that the measure of damages is the difference between the actual value of the land and its value as represented by the vendor is reversible error when it cannot be seen by an inspection of the record that the jury did not follow such instruction.

3. NEW TRIAL—AFFIDAVITS OF JURYMEN.
Affidavits of jurors showing that they did not follow the erroneous directions of the court in arriving at their verdict are inadmissible on motion for new trial, though offered in support of the verdict.

At Law. On motion for a new trial.

This is an action brought to recover damages for deceit in the sale by the defendant to the plaintiff of 2,240 acres of land situate in the county of Wells in this district. The action was tried in the territorial district court in and for Stutsman county, in the sixth judicial district, and a verdict and judgment were rendered for the plaintiff on the 26th day of November, 1888, for the sum of $12,609.58. A motion for a new trial was thereupon made by the defendant in said territorial court, which motion was pending on the 2d day of November, 1889, when the state of North Dakota was admitted into the Union. A bill of exceptions was settled by the judge of the court who tried the cause on the 30th day of August, 1889. The property in controversy is situate within the said sixth judicial district as it existed under the territorial system, and all of the said district is included within the boundaries of the state of North Dakota. Upon the admission of the state into the Union this action was transferred from the territorial court into this court upon the request of the defendant, pursuant to section 23, c. 180, (25 St. at Large, 676,) and on the 8th day of October, 1890, the said motion for a new trial was brought on to be heard before this court. The plaintiff alleges in his complaint, among other things, in substance, that on or about the 1st day of February, 1883, at Jamestown, in the county of Stutsman, and territory of Dakota, the defendant, the Northern Pacific Railroad Company, sold to this plaintiff for a valuable consideration, to-wit, the sum of $8,960, the lands in question, described as follows, to-wit: The

north one-half (N. ½) of section one, (1,) the south one-half (½) of section thirty-five, (35,) the south one-half (S. ½) of section fifteen (15,) the north one-half (N. ½) of section thirty-one, (31,) and the north one-half of the south-west quarter, (N. ½ S. W. ¼,) and the north one-half of the south-east quarter, (N. ½ S. E. ¼,) of section thirty-one, the south-west quarter (S. W. ¼) of section three, (3,)—all of said lands being in township one hundred and forty-five (145) north, range sixty-nine (69) west, of the fifth principal meridian. Also all of section twenty-three, (23,) in township one hundred and forty-five (145) north, range seventy (70) west, of the fifth principal meridian. That said sale was made to plaintiff at Jamestown aforesaid, he then and there acting and being represented by S. L. Glaspell, a resident of the city of Jamestown, the plaintiff being a resident at that time of the city of Chicago. That at the time of the sale neither this plaintiff nor the said S. L. Glaspell had been within the limits of said county of Wells, nor had seen nor had any knowledge of the situation, character, or quality of the lands except such as was imparted to them by the defendant and its agents. That at the time the sale took place the lands were covered with snow to such an extent that no examination thereof could be made which would have disclosed their quality, and that the prairie in the vicinity of the lands was then impassable by reason of the deep snow, and that no railroad was then running trains within a distance of 40 miles therefrom. That for the purpose of inducing plaintiff to make the purchase of said lands, and prior to said purchase, defendant, through its agents, made certain representations to plaintiff as to the character, quality, and situation of said lands, the number of settlers in this vicinity, and as to its adaptability to general farming purposes, as follows: That all of said lands were adapted to general farming purposes; that the soil thereof consisted of black loam soil, from 15 inches to 2 feet in depth, with clay subsoil; that it was all free from stones, sand, and gravel, except a few scattering surface stones; that it was of gentle rolling surface, and free from sloughs or water-holes; that part of it contained some good meadow land; that township 145, range 69, and township 145, range 70, in which said lands were situated, had been surveyed by the United States government; and that the even-numbered sections thereon, known as "Government Lands," were thickly settled by actual settlers residing upon and cultivating their lands. That, relying wholly upon said representations of defendant and its agents, and without having other knowlege of the character, quality, or situation of said lands, plaintiff purchased said lands of defendant in full faith and confidence in the truth of said representations so made to him. That the agents of the company who made said representations had authority to sell said lands and make said representations from the defendant. That said lands were not as represented to him. That they failed to correspond with the representations made to him as hereinbefore set forth. That none of said lands were, at the date of the purchase and sale, or at any time, adapted to general farming purposes or any purpose of farming. That the soil thereon did not then, nor at any time, consist of black loam surface soil from 15 inches

to 2 feet deep, with a clay subsoil, but, on the contrary, the black loam surface soil on said land nowhere exceeds a depth of 6 inches, and that but a small part of said land was or is covered with any black loam whatsoever. That said lands were not free from stones, sand, or gravel, but, on the contrary, are and were almost entirely composed of stones, sand, and gravel, both upon and under the surface, to such an extent as to make it unfit for any purpose of farming or agriculture, and the greater part of said lands were and are entirely unproductive of vegetation. That it was not and is not of gentle rolling surface, and free from water-holes and sloughs, but broken and hilly, and containing many sloughs and water-holes. That townships 145, range 69, and 145, range 70, had not been then surveyed by the United States government, and are not yet so surveyed. That the even-numbered sections in said townships, known as "Government Lands," were not then, and are not now, thickly settled by actual settlers residing upon and cultivating their lands, but, on the contrary, the same are entirely uninhabited and uncultivated. That said lands, at the time of the sale, had they been of the quality, character, and situation as represented aforesaid by the defendant, would have been of the actual cash value of $14,000; but the same were not then, nor at any time, of any value whatever, but were and are entirely worthless, and the plaintiff has sustained damage by reason of such false representations aforesaid in the sum of $14,000, and demands judgment for that amount, with costs. The defendant interposes a general denial.

Evidence was adduced on the parts of the plaintiff and defendant tending to prove the allegations in the complaint and answer. The evidence on the part of the plaintiff tends to show that the lands were of no actual value at the time of the sale, and that if they had been as represented they would have been worth from $5 to $7 per acre. On the part of the defendant one witness, John J. Nichols, claims to have examined the land described; says that it was probably worth about $3 per acre at the time of the sale. Another witness, Atkinson, on the part of the defendant, testified that he had examined the land in the spring of 1882, and had made memoranda, showing the character and quality of these lands, in company with John J. Nichols. He testified, among other things, substantially as follows:

"*Question.* When did you inspect or examine these lands? *Answer.* In the spring of 1882. *Q.* In company with any other person than yourself? *A.* Mr. Nichols,—John J. Nichols. *Q.* And had you made any memoranda showing the character and quality of these lands as the result of that examination? *A.* We did; yes, sir. *Q.* You spoke of having made some selections in these townships for yourself. How many sections had you selected for yourself from these townships? *A.* I selected 16 sections for the company. There was Mr. Thompson, Mr. Burdick, Mr. Smith, Mr. Decker, Mr. De Saint, and Mr. Hench, all of Davenport, were interested with me in these. I had selected section 11, township 145, range 69, and half of section 1, township 145, range 69. *Q.* Did you advise Mr. Glaspell during the course of any of these conversations that you had selected these lands from these townships? *A.* I did; yes, sir. We were talking about them. *Q.* Have you

examined at any time the north half of section 1 in township 145, range 69? *A.* Yes, sir; we did. *Q.* State to the jury the character and quality of the soil upon that section, and its general contour and configuration. *A.* It is bluffy, and it is cut up; that is, the Pipestone. I can't say whether a branch of the Pipestone touches a corner of the section; but it lays on a bluff something like this bluff here, north of the town, the south part of the section I purchased. But the north part was too bluffy to suit me. *Q.* In any of the conversations which you had with Mr. Glaspell, about which you have testified, do you remember whether you said anything to him in regard to this coulée running through the north half of the section? *A.* It wasn't a coulée. The north half of the section lies almost directly on the bluff, and the south half on the flat. *Q.* Did you advise Mr. Glaspell of that? *A.* I did. *Q.* What reply did he make, if any, to the information you gave him of that? *A.* I don't remember anything. I mentioned once that I thought that if the boom continued I might want to buy that if it wasn't bought, as I had the other half, and as it was lying near Sykeston, if it wasn't taken up. *Q.* Describe the south half of section 35 in the same township and range. *A.* My remembrance is of that section that the surface is a good deal broken. The land, I think, is not hilly, but is broken, as we found it over the prairie some places, especially near the coteaux, or where we found the soil blown off. I think there was a good deal of such land as that, and there was parts that had the appearance of tough soil. Our examination was in April, and we couldn't judge of the depth of the soil, but I judged that from the grass. *Q.* South half of section 15? *A.* I think that is better. But it is—I think there was a coulée running through that that I objected to. *Q.* About the character and quality of the soil on this land? *A.* The most of it I would judge from the growth of the grass to be very good. I would take the soil to be very good upon most of section 15. I remember particularly in the neighborhood there are—

"*Mr. Nickeus.* No, don't give us anything around in the neighborhood.

"*A.* The north half of section 31, and the north half of the north-east quarter, and north half of the south-east quarter of section 31 of the same township and range. There was a part of that section, if I remember rightly, was very stony. I can't remember just what part it was. I think there was part of it, but I am not positive. *Q.* Can you describe the character and quality of the north-west quarter of section 3 of the same township and range? I believe there is a coulée running up in that from the Pipestone; that is, in 145–69? *Q.* Yes, sir. *A.* I think there is a coulée running up. Quite a ravine running up in that section that breaks it badly. *Q.* Describe the character and quality of section 23. 145–70. That was a tolerably level section; but if I remember right, from the gravel and grass I thought that the soil was thin on that, and I think there were a good many stones on it also. *Q.* State a little more fully what experience you had in dealing in lands in this and adjoining counties, and what acquaintance you had with their value in the early part of the year 1883. *A.* Well, I had been buying and selling some lands, and had been farming to some extent, and looking at lands considerable. *Q.* What was the value of the lands per acre concerning the character and quality of which you have just testified in the month of February, 1883? *A.* Well, I cannot put a valuation on them. Our lands in that neighborhood we were holding—

"*Mr. Nickeus.* Objected to as irrelevant, incompetent, and immaterial.

"*A.* Well, I couldn't say just what such lands were worth. *Q.* Supposing that all of said lands were adapted to general farming purposes; that the soil thereof consisted of black loam surface soil; that it was all free from stones, sand, and gravel, except a few scattering surface stones; and that it was gently rolling surface, and free from sloughs or water-holes, and that part of

it contained some good meadow land; supposing all of these things to have been true,—what would have been its value per acre in the month of February, 1883? *A.* I would call that pretty good land. Such land as that would suit me. I would say that it was worth from six to seven dollars an acre located there."

The land was principally paid for in preferred stock of the Northern Pacific Railroad Company.

*S. L. Glaspell* and *E. W. Camp*, for plaintiff.

*John C. Bullitt, Ball & Smith*, and *John. S. Watson*, for defendant.

THOMAS, J., (*after stating the facts as above.*) The bill of exceptions states that the court charged the jury as to the measure of damages that if they found for the plaintiff it must be in a sum equal to the difference between the actual value of the lands and the value of the said lands as they would have been had they been as represented at the time of the sale. The defendant excepted to this instruction, and now contends that it is erroneous, and was prejudicial to the defendant. Did the court give to the jury the correct rule for the measurement of damages as applicable to the facts of this case? The action is for the recovery of damages resulting to plaintiff from alleged false and fraudulent representations. The lands were wild and uncultivated, and at the time of the sale there were only a few settlers, if any, in the vicinity where this land was situated. In an action to recover damages which the plaintiff had suffered by reason of the purchase of stock in a corporation which he was induced to purchase on the faith of false and fraudulent representations made to him by the defendant, the supreme court of the United States, in *Smith* v. *Bolles*, 132 U. S. 125, 10 Sup. Ct. Rep. 39, held that the measure of damages is the loss which the plaintiff sustained by reason of such representations, such as the amount which he paid out, and interest, and all outlays legitimately attributable to the defendant's fraudulent conduct, but it does not include the expected fruits of an unrealized speculation. The rule thus enunciated by the supreme court is binding on this court if applicable to the facts of this case. Counsel for the plaintiff contends that the rule laid down in *Smith* v. *Bolles*, *supra*, applies only to the purchase of personal property of a speculative character, and that it does not apply to the purchase of land induced by fraud, and refers to *Horne* v. *Walton*, 117 Ill. 130, 141, 7 N. E. Rep. 100, 103, which is one of the cases cited by Chief Justice FULLER in *Smith* v. *Bolles*, on page 130 of the opinion. In that case the supreme court of Illinois states that "where the sale of land is made by false and fraudulent representations as to its value, quality, or condition, the measure of damages in any action by the purchaser is the difference between the actual value of the land and its value as represented to be at the time of the sale." But that question was not involved in the case, and it was unnecessary to give the rule of damages on the sale of land induced by fraud. It appears in that case that the party procured a loan of $2,000 through fraud and deceit upon representations that the security was good, the security being land, when as a matter of fact it

was worthless. The court held that the actual loss to the party was the amount he had borrowed, with interest thereon while he was kept out of the possession of it. The court say, on page 135 of the opinion. "We think the true measure of damages in this case was the amount of such loss, to-wit, $2,000, and interest." In the opinion in *Smith* v. *Bolles* is cited also the case of *Crater* v. *Binninger*, 33 N. J. Law, 513, and it will be found in that case that the New Jersey court laid down an entirely different rule as to the measure of damages on the sale of lands induced by fraud. Courts have sometimes made a distinction as to the rule of damages in the sale of personal property and real property when effected or induced by fraud and false representations, but the supreme court of the United States, in *Smith* v. *Bolles*, seem to have laid down a rule applicable to the measure of damages in the sale of both classes of property coming within the line of facts applicable to that case. Judge SHIRAS has applied this rule in the case of the sale of pine lands, induced by false and fraudulent representations. *Atwater* v. *Whiteman*, 41 Fed. Rep. 427. The statute of this state, (section 1967,) which was in force also in the territory of Dakota at the time of the trial of this action, and for a long time prior thereto, is declaratory of the common-law rule as to the measure of damages as enunciated, explained, and applied in *Smith* v. *Bolles*. It reads as follows:

"For a breach of an obligation, not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

The latter part of the section "whether it could have been anticipated or not" is new, but as there is no question of remote damages in this case it is not necessary to attempt to define the meaning of these words. The balance of the section, as I have stated, is declaratory of the common law. *Fairbanks* v. *Williams*, 58 Cal. 241, 242; 2 Greenl. Ev. § 256; *Walrath* v. *Redfield*, 11 Barb. 368–371. Upon this statute and the cases of *Smith* v. *Bolles* and *Atwater* v. *Whiteman*, *supra*, I am of the opinion that the court, upon the trial of this action, should have instructed the jury that if they found for the plaintiff upon the other issues that as to the measure of damages they should find the cash value of the land in the condition it actually was at the time of the sale, and deduct such value from the sum of money invested by the plaintiff in the land, and that difference, with interest added, in the discretion of the jury, would be the proper amount which the plaintiff was entitled to recover. It follows that the instruction given by the court as to the measure of damages was erroneous, for which error a new trial must be granted, unless it appears that the error was harmless, and worked no injury to the defendant.

It is apparent that the case was tried by both parties upon the theory that the rule for the measure of damages as given by the court was the correct rule, and it must be presumed that the jury followed the instructions of the court, and applied the rule given in making up and return-

ing their verdict. The jury were the judges of the credibility of the witnesses and of the weight of the evidence. They were instructed in fact that if they found for the plaintiff they should find the actual value of the property at the time of the sale; and also that they should find what the value would have been if it had been as represented, and the difference would be the correct measure of damages. The evidence tended to show on the part of the plaintiff that the lands were of no value whatever, but that they would have been worth from $5 to $7 per acre if they had been as represented. The evidence on the part of the defendant, given by the witness Atkinson, was to the effect that they were of some value, or, in other words, the jury were at liberty to find from his evidence that the lands were of some value. The witness Nichols testified that they were worth about $3 per acre. Can this court determine from the evidence or from the record whether the jury adopted the evidence of the defendant's witnesses as to the actual value at the time of the sale, or whether they adopted the theory of the plaintiff's witnesses that they were of no value whatever? Can the court legitimately find, from the evidence, or from the record sent to this court, whether the jury adopted the theory of defendant's witnesses, and placed the actual value of these lands at $3 per acre at the time of the sale, and adopted the theory of plaintiff's witnesses that they would have been worth $7 per acre if they had been as represented, that being the highest sum placed by plaintiff's witnesses upon said lands if they had been as represented, and allowed the plaintiff the difference of $4 per acre, and interest thereon, or whether the jury adopted the theory that the lands were of no value at the time of the sale, and found that they would have been worth $4 per acre if they had been as represented, a sum lower than any of plaintiff's witnesses had placed on the land, and added interest to this sum of $4 per acre? The result or the amount of the verdict would have been the same in either case. I think it clear that this court cannot determine that question from the evidence or the record now before it. It must go outside of the record, if at all, to determine on what basis the jury figured, or what rule of calculation they resorted to in determining their verdict. It would seem that the jury would reasonably infer from the comparison of all the evidence that the lands at the time of the sale were of some value. It is notorious that the lands of the Northern Pacific Railroad Company were sought after and were readily sold in the market at and prior to that time at reasonable prices. It is possible also that if the case had been tried upon the correct theory as to the measure of damages, the value of the preferred stock with which the lands in question were principally paid for might have been a subject of inquiry on the trial, or may upon a new trial be inquired into for the purpose of ascertaining the loss sustained by the plaintiff. It is impossible for this court to say, from all the evidence, that a verdict upon a new trial will be the same, or substantially the same. In *Atwater* v. *Whiteman, supra,* the court sustained the verdict, and refused to grant a new trial, notwithstanding the jury had been erroneously instructed as to the measure of damages, for the reason that

a special verdict, in addition to the general verdict, had been found by the jury. On page 428 of the opinion Judge SHIRAS says:

"The general verdict was as follows: 'We, the jury, find a verdict for the plaintiff for $4,924.62, with interest at the rate of 7 per cent. from November 15, 1882, to January 7, 1890, amounting to $2,417.90, which, added to the last-named amount, makes a total of $7,342.50.' In answer to specific questions submitted the jury found that the fair cash value of the land at the time of the sale was $1.25 per acre, and that if the land had, at the time of the sale, been equal in quality and value to what defendant represented it to be, the value thereof would have been $11,598.13. The undisputed evidence shows that there was invested in the land the sum of $6,964, belonging to the plaintiff. Deduct from this amount the value of the land at the rate of $1.25 per acre, as found by the jury, and we get the exact sum found by the jury in the general verdict in the amount of damages, to-wit, $4,924.62. It is therefore clear, beyond question, that the jury, in estimating the damages, in fact carried out the rule laid down in *Smith* v. *Bolles*."

There are no facts on the face of the record presented to this court in the case at bar that would enable it to say that the jury in estimating the damages in effect carried out the rule laid down in *Smith* v. *Bolles*, or reached substantially the same result they might have reached if that rule had been given to them by the court. The plaintiff claims that there was no prejudicial error in the giving of the instruction, for the reason that the jury in fact only allowed the purchase money, and interest, and that affidavits of jurors are admissible to show this fact to sustain the verdict, and in support of his contention therein produced and read upon the hearing of the motion for a new trial in this court the following affidavits signed by eight of the jurors:

"*State of North Dakota, County of Stutsman—ss.*

"M. W. Wright, P. V. Fellows, J. H. Sears, and Joseph Stine, being each duly sworn, deposes and says, each for himself, that he was one of the jurors in the trial of the above-entitled action, in which a verdict was rendered in the district court of the then territory of Dakota, in the county of Stutsman, on the 24th day of November, A. D. 1888, and in arriving at said verdict the jury estimated the land sold by defendant to plaintiff to be of no value, and that plaintiff paid therefor the sum of $8,960, or $4 per acre, for 2,240 acres. The sale was made on or about March 6th, 1883. They considered that the land would have been worth, if it had been as represented, the sum of $4 per acre, and that plaintiff had lost by the transaction the price he paid, with interest. It was the intention or aim of the jury to render a verdict for the plaintiff equal to the amount of money which he had paid to defendant, with interest at 7% per annum."

"*State of North Dakota, County of Stutsman—ss.*

"William Harselew, R. M. Clayton, A. M. Davis, and Charles Riemenschneider, being first duly sworn, each for himself deposes and says that he was one of the jurors in the trial of the above-entitled action in the district court of the then territory of Dakota, county of Stutsman, in which a verdict was rendered on the 24th day of November, 1888. In reaching such verdict the jury estimated the land sold plaintiff by defendant to be worthless and of no value, and that plaintiff paid therefor the sum of $8,960 on or about March 6th, 1883. We considered that if the land had been as represented that it would have been of the value of $8,960, and that plaintiff had lost, by reason of the transaction, the sum paid, with interest at seven per cent. per annum."

And in support of these affidavits of the jurors they also read the following affidavits:

"*State of North Dakota, County of Stutsman—ss.*

"Theodore F. Branch, being first duly sworn, deposes and says that he is the clerk of the district court for Stutsman county, North Dakota; that at the November, 1888, term he was a bailiff in said court, and was present in said court during the trial of the case of *Albert H. Glaspell* vs. *Northern Pacific Railroad Company*, and was one of the witnesses in said action, and testified in regard to a survey and examination of the lands (2,240 acres) involved in said action made by himself; that he was the bailiff in charge of the jury in said action during their deliberations over their verdict; that said jury returned a sealed verdict into court about eleven (11) o'clock P. M.; that immediately after said jury left the jury-room this affiant found therein a paper upon which a calculation of interest had been made upon a principal sum of $8,960, amounting in all to $12,545.43, being the amount of the verdict in said action; that at the same time this affiant returned with said paper into the court-room, and made the statement to S. L. Glaspell and E. W. Camp that he could tell what the verdict would be. Affiant found said paper on the table used by said jury in arriving at their verdict, and there was no other paper in said room with figures thereon or calculations of any kind."

"*State of North Dakota, County of Stutsman—ss.*

"Edgar W. Camp, being first duly sworn, says he was one of the attorneys for plaintiff in the action mentioned in foregoing affidavit of Theodore F. Branch. Affiant, with others, waited in the court-room till after the jury agreed and returned a sealed verdict. After the verdict had been agreed upon, and the jury had left the jury-room, said Branch went into the jury-room and soon after returned to the court-room, holding in his hand a piece of paper, which he seemed to be examining. Branch said that he would like to make a bet that he could guess within five dollars of the amount of the verdict. To the best of affiant's recollection affiant soon after saw the said paper and examined it, and that it contained a calculation of interest. Affiant does not recollect the sums and amounts, but recollects that the verdict read the next day tallied with the calculations on the paper."

"*State of North Dakota, County of Stutsman—ss.*

"S. L. Glaspell, being first duly sworn, says that he was one of the attorneys for the plaintiff in the trial of the above-entitled action; that he saw the paper referred to in the above affidavit within five minutes of the time the said jury left the jury-room, and returned their verdict, sealed, to the clerk; that he immediately telegraphed the plaintiff, who had previously left the city, the verdict, and based the sum upon the figures in said paper, and he had no other knowledge or information of the verdict than was disclosed by said paper. The same contained a calculation of interest in the sum of $8,960, at 7% interest, to the date of the verdict. The figures telegraphed by affiant as the verdict in said case was the exact amount as afterwards shown by the verdict when opened in court. Affiant had no conversation with any juror prior to the opening of said verdict in court as to the amount thereof, and had no knowledge or information of the amount thereof save as was disclosed by said paper."

These affidavits were read subject to the objection of the defendant. Are these affidavits admissible for the purpose claimed? The material part of the affidavit of Branch is that "said jury returned the verdict into court about 11 o'clock P. M.; that immediately after said jury left

the jury-room this affiant found therein a paper upon which a calculation of interest had been made, upon a principal sum of $8,960, amounting in all to $12,545.43, being the amount of the verdict in said action;" and that he communicated these facts to Camp and Glaspell; "that affiant found said paper on the table used by said jury in arriving at their verdict, and there was no other paper in said room with figures thereon or calculations of any kind." The effect of the affidavits of Camp and Glaspell is that they saw the paper immediately after as shown to them by Branch. Giving full effect to these affidavits, the most they show is that the jury figured from a principal sum of $8,960, at 7 per cent. interest, and reached the sum of $12,545.43, being the amount of the verdict. If the jury had found the actual value of the land to be $3 per acre, and the value as represented at $7 per acre, the same result would follow as above suggested. We must therefore go to these affidavits of the jurors to sustain this verdict, if at all. Are these affidavits of jurors admissible to show on what grounds, or by what process of reasoning, the jury found and rendered their verdict? Can the plaintiff show by these affidavits that the jury disregarded the instructions of the court, and the theory on which the case was tried, in respect to the measure of damages, and that they adopted the correct rule, and gave the verdict for the loss the plaintiff had sustained by reason of the fraud? This is the proposition presented, and I have been unable to find any well-considered authority to sustain it. Upon the grounds of public policy, the courts have almost universally agreed upon a rule that no affidavit, deposition, or sworn statement of a juror shall be received to impeach the verdict or to explain it, or show on what grounds it was rendered. Thomp. & M. Juries, § 440, and cases there cited; Id. § 451; *Hudson* v. *State*, 9 Yerg. 408; *Larkins* v. *Tarter*, 3 Sneed, 681. 2 Thomp. Trials, § 2627, and cases cited. It has been held in Massachusetts that when a jury have returned into court with their verdict, before they are discharged, and while they are yet a jury, it is competent for the court to interrogate them as to the grounds of their finding if there is more than one distinct ground on which the verdict may be given. *Parrott* v. *Thacher*, 9 Pick. 426; *Biggs* v. *Barry*, 2 Curt. 259. I apprehend that these courts would not extend the rule so as to admit the affidavits of jurors as to the grounds on which the verdict was rendered, even if all the jurors had made and joined in the affidavits, especially after they had separated and ceased to become a jury in the case. In *Roberts* v. *Hughes*, 7 Mees. & W. 399, the English court of exchequer held that the rule does not exclude jurymen from swearing to what took place in open court, but only to what took place in their private room, or as to the grounds on which they found their verdict. While the testimony of the jurors will not be received to impeach their verdict, it will be received to sustain the verdict when assailed. This rule is invoked generally and almost universally when the verdict is assailed on account of alleged misconduct of jurors, and it is not only adopted in the furtherance of justice, but to vindicate the jurors themselves. Thomp. & M. Juries, § 446; *Wright* v. *Telegraph Co.*, 20 Iowa, 195; *Hall* v. *Robison*, 25 Iowa, 91; Proff.

Jury, § 408, and cases cited; *People* v. *Hunt,* 59 Cal. 430–432; *People* v. *Goldenson,* 19 Pac. Rep. 172.

The case of *Dalrymple* v. *Williams,* 63 N. Y. 361, and *Hodgkins* v. *Mead,* (N. Y.) 23 N. E. Rep. 559, are relied on by plaintiff to support his contention that the affidavits of the jurors are admissible to sustain the verdict; but in both of these cases the facts are materially different from the case at bar. In *Dalrymple* v. *Williams* the foreman announced as the verdict of the jury a general verdict against both defendants. It was claimed that the real verdict as agreed upon was in favor of Williams and against the other defendant; and the affidavits of the jurors stating these facts, and the fact that the foreman had made a mistake in announcing the verdict in court, were admitted. The affidavits were admitted simply to correct a mistake made in open court, and not to explain or give the grounds on which the verdict was based. On page 365 of the opinion Mr. Justice ALLEN, speaking for the court, refers to *Jackson* v. *Dickenson,* 15 Johns. 309, and to *Roberts* v. *Hughes, supra,* with approval. He says:

"In *Jackson* v. *Dickenson* the affidavits of the jurors were held admissible to show that a mistake had been made in taking their verdict, and that it was entirely different from what was intended. The court draws a distinction between what transpires while the jury are deliberating on their verdict and what takes place in open court in returning their verdict, holding the statements of jurors admissible as to the latter, but not as to the former. *Roberts* v. *Hughes,* 7 Mees. & W. 399, is like the last case quoted. The affidavits of the jurors were received as to what took place in open court on the delivery of the verdict, to correct it."

In *Hodgkins* v. *Mead, supra,* which was an action brought by a real-estate broker for commissions, the defendant contended that the payment of commissions was conditional on the completion of the contract by the purchasers, but no question was made as to the amount. On page 559 of the opinion Justice PECKHAM, speaking for the court, says:

"The answer set up a special contract between the parties by which the plaintiff was to claim and be entitled to no commissions except upon the performance by the proposed purchasers of the property of the special contract of sale entered into between them and the defendant, and the answer alleged a failure by the proposed purchasers, and that on account thereof the plaintiff had not earned his commissions. This was the sole question at issue between the parties, and it was assumed and conceded that, if the plaintiff was entitled to a verdict at all, it was for the 1 per cent. upon $80,000, with interest from the time it was due. The charge of the judge to the jury was explicit upon that point, and he stated in so many words that, if the plaintiff was entitled to a verdict, he must recover his commissions upon the purchase price with interest, amounting in all to the sum of $848. The judge further said: 'Now, you have a single question of fact to decide, whether you believe the testimony of the plaintiff, or the testimony of Mead, Sergeant, and Meldrum, as to this arrangement made on the 21st day of February. If you find that there was an arrangement made that the commission of plaintiff was conditional, then your verdict will be for the defendant, because the condition was never complied with. If, on the other hand, there was no condition, it is admitted here that the plaintiff was employed, and that he found a purchaser, and that the plaintiff would be entitled to a verdict.'"

The precise amount of such verdict had already been stated by the court, and there was no dispute about it. It was conceded that the amount of the verdict, if for the plaintiff, must be 1 per cent. upon the $80,000, with interest. It was clear beyond dispute that the amount must be the same upon another trial. The amount was really agreed upon, but the foreman neglected to hand the amount to the court in the sealed verdict. The case was decided on the principle enunciated in the case of *Dalrymple* v. *Williams, supra.* The affidavits were admissible to correct a mistake made in open court in not announcing the actual verdict agreed upon by the jury, on the principle laid down in *Jackson* v. *Dickenson* and *Roberts* v. *Hughes, supra.* It was upon this principle that the court allowed the verdict to be amended in *Burlingame* v. *Railroad,* 23 Fed. Rep. 706. In my opinion the affidavits of all the jurors would not have been admissible to sustain this verdict, much less the affidavits of eight of the jurors, who attempted to speak for the entire jury. The objection of the defendant to the admissibility of the affidavits is therefore sustained. It is claimed by the attorney for the plaintiff that it was admitted upon the argument in this court that the land was worthless, and, that being so, it necessarily follows that the jury must have adopted that theory. I do not understand that defendant's attorney made so broad an admission, but if he did it does not follow that the jury adopted that theory as the basis of their calculations in view of the evidence. It follows that for the reasons hereinbefore stated a new trial must be granted, and it is accordingly ordered. It is unnecessary to notice the other assignments of error.